IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LANIECA HUFF, | ) | CASE NO.  1:14-cv-02179 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Lanieca Huff ("Plaintiff" or "Huff") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her

applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties. Doc. 13.  As explained more fully below, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

Huff protectively filed applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on April 19, 2011.[1]  Tr. 22, 205-211, 214-220, 236, 237.

She alleged a disability onset date of February 18, 2011 (Tr. 22, 205, 214, 236), and alleged

disability due to epilepsy, numbness in lower right leg and foot, uterus fibroids, anemia, high

blood pressure, a history of subdural hematoma, and anxiety (Tr. 27, 77, 107, 139, 148, 241).

Huff's application was denied initially and upon reconsideration by the state agency.  Tr. 139-

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 9/3/2015).

145, 148-153.   Thereafter, she requested an administrative hearing.  Tr. 155.   On February 27,

2013, Administrative Law Judge Thomas M. Randazzo ("ALJ") conducted an administrative

hearing.  Tr. 37-76.

In his May 17, 2013, decision, the ALJ determined that Huff had not been under a

disability from February 18, 2011, through the date of the decision.  Tr. 19-36.  Huff requested

review of the ALJ's decision by the Appeals Council.  Tr. 17.  On August 18, 2014, the Appeals

Council denied Huff's request for review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal and educational evidence

Huff was born in 1975.  Tr. 31, 205, 214, 236.  She obtained her GED in 2001.  Tr. 242.

Huff had four children, one son and three daughters.  Tr. 45-46.  In 2012, one of her daughters

and a granddaughter were killed.  Tr. 46.   After losing her daughter and granddaughter, Huff

moved around a lot and lived with various family members.  Tr. 47-48.  At the time of the

hearing, Huff's 15 year old son was living with her in one of her daughter's father's houses.  Tr.

46.

### B.      Vocational evidence

#### 1.      Past work experience

Huff last worked at Greyhound as a ticket agent/transportation clerk.  Tr. 42-43, 65.  She

was let go by Greyhound on February 18, 2011, as a result of a misunderstanding with

management regarding a customer not receiving a receipt for his baggage.  Tr. 43.  She also

worked in the past as a cashier and sales attendant.  Tr. 64-65.

#### 2.      Vocational rehabilitation reports

_December 2, 2011_

On December 2, 2011, Ronna Woods, an eligibility counselor with the Rehabilitation Services Commission of Ohio ("RSC"), indicated that Huff was eligible for services through the RSC and determined that Huff's priority status was "most significantly disabled." Tr. 419.  Ms. Woods informed Huff that she would be provided vocational counseling and guidance throughout the vocational rehabilitation process and it was expected that the vocational rehabilitation services would take, at minimum, 6 months to complete.  Tr. 419.

_February 2, 2012_

On February 2, 2012, Kristin Dhayer, M.R.C., CRC, a vocational rehabilitation consultant with Vocational Services Unlimited, completed a Vocational Evaluation Report.  Tr. 451-464.  Ms. Dhayer identified jobs that Huff should consider based on her work experience, transferable skills, academic abilities, work values, and interests.  Tr. 458.  The jobs identified were companion; food assembler/dining service worker; cleaner, housekeeping; bill collector; teller; and front desk clerk.  Tr. 458.  Ms. Dhayer indicated that Huff's assets with respect to employability were her motivation to return to the workforce; her good academic skills; her ability to learn new tasks; and that she had transferable skills.  Tr. 463.  Ms. Dhayer indicated that Huff's barriers to employability were her reliance on public transportation and that she may have some difficulties with memory.  Tr. 464.  Ms. Dhayer concluded that Huff was ready for competitive employment.  Tr. 464.  She noted, however, that employment would be part-time, "as indicated by her physician."  Tr. 464.

## C.    Medical evidence[2]

---

[2] Included in the administrative record are records that post-date the ALJ's hearing and decision.  Tr. 480-522.  The court may not consider evidence that was not submitted to the ALJ in the sentence four context; it only can consider such evidence in determining whether a sentence six remand is appropriate.  _See Bass v. McMahon_, 499 F.3d 506,

1.     **Treatment history**

Huff was diagnosed with an acute subdural hematoma and, on October 9, 2006, she underwent a left frontal craniotomy and evacuation of an acute subdural hematoma and a left durectomy-central frontal temporal.  Tr. 303-308.

On November 8, 2010, Huff presented to the emergency room with left-sided chest pain. Tr. 322.  She was hospitalized from November 8, 2010, through November 10, 2010, for hypertensive urgency and iron-deficiency anemia.  Tr. 322-323.  Huff was prescribed medication and discharged in stable condition.  Tr. 323.

On March 11, 2011, Huff presented to the emergency room.  Tr. 330-332.  Huff's son reported witnessing his mother having a seizure, stating that Huff had come out of their kitchen and was not talking, was looking at pictures on the wall, made a noise, and fell scraping her head on the table on the way down.  Tr. 330.  Huff's son indicated that the episode lasted about 15 seconds and it took his mother 2 minutes to awaken.  Tr. 330.  She also had urinary incontinence during the episode.  Tr. 330.  When arriving at the emergency room, Huff was crying and anxious but otherwise asymptomatic.  Tr. 330.  Neurology was consulted.  Tr. 331.  The emergency room physician concluded that Huff had had a generalized tonic-clonic seizure[3] without a clear metabolic etiology, noting that there was no electrolyte abnormality to explain the seizure.  Tr. 331.  A head CT scan did show that Huff was status post left frontal craniotomy. Tr. 331.  The emergency room physician indicated that "[g]iven the patient's past history of craniotomy, the seizure can be most likely attributed to formation of scar tissue in the brain."  Tr.

---

513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.  Plaintiff does not seek a sentence six remand.  Thus, the records which post-date the ALJ's hearing and decision are not for the Court's consideration.

[3] "Generalized tonic-clonic seizure" is defined as "the seizure of grand mal epilepsy, consisting of a loss of consciousness and generalized tonic convulsions followed by clonic convulsions."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1688.

331.  The recommendation was for Huff to attend a follow-up visit with neurology in one week and Keppra was prescribed.[4]  Tr. 331.  Huff was discharged in stable condition.  Tr. 331.

On March 16, 2011, Huff was seen by Dr. Kitti Kaiboriboon, M.D., in the neurology department at University Hospitals for further evaluation and management of her seizures.  Tr. 391-393.  Based on Huff's reports of poor sleep for a few days leading up to her seizure, Dr. Kaiboriboon indicated that inadequate sleep may have been a precipitating factor.  Tr. 391.  As far as epilepsy risk factors, Dr. Kaiboriboon noted that Huff had a history of head trauma in 2001 and 2006, with subdural hematoma and brain surgery in 2006.  Tr. 391.  Dr. Kaiboriboon recommended that Huff undergo epilepsy monitoring and have a brain MRI performed.  Tr. 393.  She also recommended that Huff continue levetiracetam 500 mg twice daily.  Tr. 393.  Dr. Kaiboriboon instructed Huff "not to drive, not to work in close proximity of machines with moving parts, [and] not to swim unsupervised or to work at high places."  Dr. Kaiboriboon also instructed Huff "to shower (without accumulation of water) instead of taking a bath if unsupervised."  Tr. 393.

Huff's brain MRI was performed on March 17, 2011.  Tr. 376-377.  Dr. Michael Coffery, M.D., interpreted the MRI and indicated that the MRI showed post-operative changes compatible with a previous left-sided craniotomy; mild dural enhancement deep to and surrounding the left-sided craniotomy site, likely postsurgical/reactive in etiology; surgical resection cavity and/or areas of encephalomalacia involving the left temporal lobe and left parietal lobe but no discrete abnormal enhancement identified in those regions; a single small focus of nonspecific subcortical white matter change noted within the right frontal lobe adjacent to the right frontal operculum; and inflammatory changes within the paranasal sinuses.  Tr. 376-377.  With respect to the

---

[4] The generic name for Keppra is levetiracetam. *See* http://www.webmd.com/drugs/2/drug-18053/keppra-oral/details (last visited 9/3/2015).

nonspecific sobcortical white matter, Dr. Coffey noted that, while nonspecific, such subcortical white matter changes can be seen with migraine headaches, hypertension, small vessel ischemic change, or demyelinating processes.  Tr. 377.

On April 8, 2011, a pelvic ultrasound revealed that Huff had an "enlarged fibroid uterus" and a likely endometrial fibroid or possibly an atypical polyp.  Tr. 374.  There was also a small amount of free fluid noted in the endometrial canal.  Tr. 374.  Also, on April 8, 2011, a lumbar spine MRI was performed due to sciatic leg pain and previously noted spondylolisthesis.  Tr. 375.  The MRI showed degenerative disc disease at L4-L5 and L5-S1, more prominent at L5-S1.  Tr. 375.  Also, there was displacement of traversing right L5 and S1 roots; mild compression on the right S1 root at the L5-S1 level; and diffuse abnormal marrow signal that was nonspecific but consistent with systemic anemia.  Tr. 375.

As a result of her March 2011 seizure, on August 1, 2011, through August 6, 2011, upon Dr. Kaiboriboon's referral, Huff was admitted to the Epilepsy Monitoring Unit at University Hospitals for seizure evaluation.  Tr.  356-365.  During her admission, Huff was taken off Keppra.  Tr. 364.  One electrographic seizure was recorded on August 2, 2011, when Huff was sleeping.  Tr. 363, 364.  The EEG onset for the one electrographic seizure was at the left temporal side with rhythmic discharges in the left temporal region that lasted approximately three minutes.  Tr. 363, 364.  There were no EKG changes and no clinical event was recorded.  Tr. 363.  The evening before her discharge, Huff was started back on Keppra.  Tr. 364.  She was discharged in good condition.  Tr. 364-365.  On discharge, Huff's neurological exam was nonfocal and normal.  Tr. 365.  Huff's discharge diagnoses were generalized clonic epilepsy and a history of left temporoparietal subdural hematoma in 2006.  Tr. 364.   She was instructed to:

only shower, not bathe unsupervised; not drive; and follow up with Dr. Kaiboriboon in four weeks for further management of her epilepsy.  Tr. 365.

On September 12, 2011, Huff saw Dr. Kaiboriboon for follow up after her admission to the Epilepsy Monitoring Unit.  Tr. 385-387.  Huff reported that she had been having right arm shaking and jerking and, at times, stiffening.  Tr. 385.  Huff indicated that the episodes lasted between 2 and 3 minutes.  Tr. 385.  Huff reported having the episodes quite often but could not recall when her most recent episode had occurred.  Tr. 385.  Huff denied losing track of time, staring spells, or generalized seizure.  Tr. 385.  Huff's physical examination was generally normal.  Tr. 386.  Dr. Kaiboriboon concluded that Huff's right arm shaking/jerking/stiffening was likely the result of partial seizures.  Tr. 386.  Dr. Kaiboriboon recommended a PET (Positron Emission Tomography) diagnostic study and neuropsychological testing.  Tr. 386-387.  Dr. Kaiboriboon increased Huff's levetiracetam and instructed Huff not to drive, not to work in close proximity of machines with moving parts, not to swim unsupervised or to work at high places, and to shower (without accumulation of water) instead of taking a bath unsupervised.  Tr. 386.

The PET was performed on September 15, 2011, revealing "[m]ildly decreased FDG metabolism within the left temporal lobe with a more focal area of markedly decreased FDG metabolism, corresponding to an area of encephalomalacia," which the interpreting physician indicated "can represent an epileptic focus."  Tr. 372.

On October 5, 2011, Huff had a follow-up visit with Dr. Kaiboriboon regarding her epilepsy.  Tr. 382-384.  Huff reported a decrease in the frequency of her seizures following the increase in the levetiracetam dosage amount.  Tr. 382.  Huff reported three seizures since her prior visit, which she described as right forearm shaking for about a minute with no other associated symptoms.  Tr. 382.  During the visit, Dr. Kaiboriboon observed a tremor-like

movement in Huff's right arm lasting about 30 seconds.  Tr. 382.  Huff did not lose awareness and was able to count down from 100 during the event.  Tr. 382.  Huff admitted missing doses of her levetiracetam every 2-3 weeks but could not recall whether the seizures occurred when she missed a dose of her medication.  Tr. 382.  Regarding side-effects from the medication, Dr. Kaiboriboon noted that Huff stated she is often tearful and sometimes feels imbalance when she attempts to turn around.  Tr. 382.  Huff denied feeling depressed but cried easily for no clear reason.  Tr. 382.  Other than decreased sensation to pinprick and light touch on right arm, physical examination findings were normal.  Tr. 383.  Dr. Kaiboriboon indicated that Huff's seizures appeared to be responding well to the levetiracetam but noted that Huff was still continuing to have seizures and was experiencing side-effects from the levetiracetam.  Tr. 384. Dr. Kaiboriboon recommended continuing the levetiracetam and starting Huff on lamotrigine.[5] Tr. 384.  Huff was prescribed a Lamictal started kit.  Tr. 384.  Dr. Kaiboriboon continued to instruct Huff not to drive, not to work in close proximity of machines with moving parts, not to swim unsupervised or to work at high places and to shower (without accumulation of water) rather than bathe, if unsupervised.  Tr. 384.

On November 17, 2011, Huff was seen at the emergency room after having had a seizure two hours prior to arriving at the emergency room.  Tr. 366-367.  Huff reported that she had shaking of her four limbs and seizing for about 20 minutes.  Tr. 366.  Huff reported a left-sided headache.  Tr. 366.  On physical examination, Huff had some tenderness on the left side of her head but no neurological deficits.  Tr. 367.  Huff's lab results showed some infection in her urine.  Tr. 367.  She was discharged home with Macrobid for seven days and Lamictal.  Tr. 367.

---

[5] Lamotrigine is a generic name for Lamictal. *See* http://www.webmd.com/drugs/2/drug-4582-7217/lamotrigine-oral/lamotrigine-oral/details (last visited 9/3/2015).

On November 29, 2011, Huff saw Dr. Kaiboriboon for follow up.  Tr. 379-380.  Huff reported having three generalized seizures on November 17, 2011, which resulted in emergency room treatment.  Tr. 379.  Dr. Kaiboriboon noted that, prior to having the seizures on November 17, 2011, Huff had reached 200 mg of lamotrigine but ran out of the medication and had stopped taking the lamotrigine three days before she had the seizures.  Tr. 379.  Aside from the November 17 seizures, Dr. Kaiboriboon indicated that Huff's focal seizures appeared to be controlled better.  Tr. 379.  Huff was reporting only mild (just feeling right arm shaking) and infrequent episodes since she had started taking the lamotrigine.  Tr. 379.  Huff was having posterior headaches every morning which were similar to the type of headache she had after a seizure.  Tr. 379.  Huff could not say whether she was having seizures at night.  Tr. 379.  She planned to have a family member stay with her at night to determine whether she was having seizures at night.  Tr. 379.  Huff denied side-effects from her medication and reported good compliance.  Tr. 379.  On physical examination, Huff's sensation was decreased to pinprick and light touch on the right arm; rapid alternating movements were slow on the right; and her Romberg test was negative but she felt like she was swaying to the left.  Tr. 380.  Dr. Kaiboriboon concluded that Huff's most recent generalized seizures were likely due to noncompliance.  Tr. 381.  Dr. Kaiboriboon's recommendations included continuing the levetiracetam and increasing the lamotrigine dose as long as it did not cause an increase in somnolence.  Tr. 381.  Dr. Kaiboriboon again instructed Huff not to drive, not to work in close proximity of machines with moving parts, not to swim unsupervised or to work at high places and to shower (without accumulation of water) rather than bathe, if unsupervised.  Tr. 381.

On January 7, 2012, Huff presented to the emergency room complaining of chest pain for two days, shortness of breath, dyspnea on exertion, and a cough.  Tr. 410-411.  A diagnostic

EKG was performed showing a sinus rhythm with a rate of about 100 and some left atrial enlargement.  Tr. 411.  The emergency room physician diagnosed likely bronchitis, possible early developing pneumonia, and chest wall pain.  Tr. 411.  A Z-pak was prescribed for possible bronchitis/early pneumonia and she was sent home with instructions to follow up with her primary care physician in 3-5 days.  Tr. 411.

On January 9, 2012, Huff saw Dr. Kaiboriboon for follow up regarding epilepsy.  Tr. 428-430.  Huff reported that she had been doing well without seizures since her last visit.  Tr. 428.  Huff did report, however, that she had recently been seen in the emergency room for chest pain with a diagnosis of bronchitis.  Tr. 428.  Huff reported that her chest pain was better.  Tr. 428.   On physical examination, Huff's sensation was decreased to pinprick and light touch on the right arm; rapid alternating movements were slow on the right; and her Romberg test was negative but she felt like she was swaying to the left.  Tr. 429.  Dr. Kaiboriboon concluded that Huff's seizures were being controlled by a combination of levetiracetam and lamotrigine and indicated that Huff denied any significant side-effects.  Tr. 430.  Dr. Kaiboriboon continued to instruct Huff not to drive, not to work in close proximity of machines with moving parts, not to swim unsupervised or to work at high places and to shower (without accumulation of water) rather than bathe, if unsupervised.  Tr. 430.  Dr. Kaiboriboon recommended that Huff continue with those activity restrictions until 6 months after her last seizure, i.e., until May 2012.  Tr. 430.

Huff saw Dr. Kaiboriboon again on June 1, 2012.  Tr. 425-427.  Huff relayed that her daughter and granddaughter had died in February and since then Huff had had at least four episodes of possible seizures.  Tr. 425.  The left side of her face and jaw was tensing up and her left ear was pulling backwards.  Tr. 425.  The episodes lasted for a minute and she felt fine afterwards.  Tr. 425.  The most recent episode had been two weeks prior to Huff's June 2012

visit with Dr. Kaiboriboon.  Tr. 425.  Huff denied any recent generalized seizures, indicating that her last generalized seizure had occurred in November 2011.  Tr. 425.  Physical examination findings were similar to physical examination findings from Huff's prior visit with Dr. Kaiboriboon.  Tr. 426.  Dr. Kaiboriboon assessed lesional left temporal lobe epilepsy and indicated that the nature of Huff's recent episodes was unclear and she recommended that Huff be seen again by the Epilepsy Monitoring Unit.  Tr. 427.  However, in light of Huff's recent loss of her daughter and granddaughter, both Dr. Kaiboriboon and Huff agreed to postpone further evaluation until a later time.  Tr. 427.  Dr. Kaiboriboon continued Huff on levetiravetam and lamotrigine and continued to instruct her not to drive, not to work in close proximity of machines with moving parts, not to swim unsupervised or to work at high places, and to shower (without water accumulation) rather than bathe, if unsupervised.  Tr. 427.  Dr. Kaiboriboon planned to see Huff for follow up in 6 months and instructed Huff to call if there was any exacerbation of her seizures or medication side-effects.  Tr. 427.

On December 9, 2012, (Tr. 474-478) and December 11, 2012, (Tr. 465-473) Huff presented to the emergency room with complaints of chest pain and shortness of breath and also complained of swelling on her left lower leg.  Tr. 465-478.  During her December 9, 2012, visit, the emergency room physician indicated that, once Huff sat down, her shortness of breath started to alleviate and she did not have chest pain.  Tr. 475.  Therefore, no acute interventions were required.  Tr. 475.  Various tests were conducted and lab work showed evidence of anemia.  Tr. 475.  As a result, a transfusion was ordered for symptomatic anemia.  Tr. 475.  Huff indicated that she had stopped taking her anemia pills approximately 6 months prior.  Tr. 474.  A pelvic ultrasound showed multiple uterine fibroids and bilateral ovarian cysts.  Tr. 477.  When Huff returned to the emergency room on December 11, 2012, she had not obtained her antibiotics and

her iron pills that were prescribed on December 9, 2012.  Tr. 467.  During her December 11, 2012, visit, Huff was diagnosed with chest pain and lower extremity edema with cellulitis.  Tr. 470.  The emergency room physician wanted to have a venous Doppler ultrasound performed to rule out underlying deep venous thrombosis but Huff left in stable condition against medical advice without having the ultrasound completed.  Tr. 470.

### 2.       Medical opinion evidence

Huff was examined by two psychologists, Dr. Konieczny and Dr. Litwin, and an internal medicine physician, Dr. Paras.  As discussed below, each of these one-time consultative examiners prepared reports of their evaluations and offered their opinions regarding Huff's functional abilities.[6]

### a.       Psychologist J. Joseph Konieczny, Ph.D.

On September 9, 2011, psychologist J. Joseph Konieczny, Ph.D., saw Huff and conducted a one-time consultative psychological evaluation.  Tr. 336-341.  Dr. Konieczny's diagnoses included anxiety disorder, not otherwise specified and personality disorder, not otherwise specified (with histrionic features).  Tr. 340.  Dr. Konieczny assessed Huff with a GAF score of 52.[7]  Tr. 340.  Dr. Konieczny opined that Huff (1) showed no significant deficits in her

---

[6] State agency reviewing physicians and psychologists also rendered opinions concerning Huff's physical and mental RFC.  Tr. 81-87, 112-118.  Physically, the state agency reviewing physicians opined that Huff would be limited to light work with additional limitations of occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds, occasional balancing, stooping, kneeling, and crouching, never crawling, and avoiding all exposure to hazards such as machinery and heights.  Tr. 30, 83-85, 114-116.  Mentally, the state agency reviewing psychologists found moderate limitations in Huff's ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods;  complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  Tr. 85-87, 116-118.

[7] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric

ability to understand, remember, and carry out instructions; (2) would have some difficulty in maintaining persistence, particularly with moderately complex multi-step tasks; (3) would have difficulty with supervision in the work setting because of her anxiety; and (4) would appear to have very significant coping deficits because of her anxiety and would have difficulty in even mild pressure situations in the work setting.  Tr. 340.  Dr. Konieczny stated that Huff's "overall level of functioning is at a slightly reduced level of efficiency."  Tr. 340.

### b.  Licensed Clinical Psychologist Richard G. Litwin, Ph.D.

Upon a referral from a vocational counselor, on September 27, 2011, clinical psychologist Richard G. Litwin, Ph.D., conducted a one-time neuropsychological evaluation for the purpose of identifying any cognitive or aptitude restrictions that might impact vocational planning.  Tr. 446-450.  Huff reported to Dr. Litwin that she felt that her memory was bad and getting worse since she started having seizures.  Tr. 446.  She also indicated some word finding difficulties.  Tr. 446.  Dr. Litwin performed a number of tests to assess Huff's intellectual functions, aptitude skills, memory skills, executive functions, and emotional functioning.  Tr. 447-448.

With respect to intellectual functions, Dr. Litwin found that "[t]here was no obvious decline in processing speed as might occur with a head injury or weakness in attention span or working memory."  Tr. 447.  Dr. Litwin stated further that, "[i]n general, Lanieca's intellectual abilities appear intact with strong learning potential given her average IQ."  Tr. 447.

With respect to aptitude skills, Dr. Litwin found that "[t]here was no evidence of word finding problems or reduced verbal fluency[,] [w]ord reading and spelling skills are strong[,] [and] [g]ood facility with numbers on paper and pencil math was noted."  Tr. 447.

---

Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

With respect to memory skills, Dr. Litwin found that Huff "has some underlying weaknesses in memory."  Tr. 448.  Dr. Litwin noted that "[d]uring the initial learning and acquisition phase, there was slow learning despite repetition."  Tr. 448.  Also, "[r]educed confidence in verbal memory for unstructured material was noted [and] [a]fter a brief delay, there was some mild memory decay on free recall with poor performance on recognition trials."  Tr. 448.  Dr. Litwin indicated that the foregoing findings confirmed Huff's perception that her memory was impaired.  Tr. 448.  Dr. Litwin opined that Huff "will need repetition, cues and material presented in a logical manner [and] [l]engthy unstructured material will be harder for her to recall."  Tr. 448.

With respect to executive functions, Dr. Litwin found that Huff "performed better than expected on measures of executive functioning."  Tr. 448.

With respect to emotional functioning, Dr. Litwin indicated that Huff endorsed "some moderate distress associated with worry.  She cries easily, is sensitive to criticism, has poor appetite, may not sleep well, feels hopeless and is very self-conscious around others and fearful that others will take advantage of her."  Tr. 448.

Dr. Litwin diagnosed cognitive disorder, NOS (memory decline) and depressive disorder, NOS.  Tr. 449.  He opined that functional limitations based on testing included reduced self-direction due to memory loss and potential difficulty with motivation and mental persistence due to underlying depression and distrust of others.  Tr. 449.  Dr. Litwin noted that the Keppra that Huff was taking may cause some memory loss as a side-effect and, therefore, if Huff felt her memory was continuing to decline, she might want to speak with her doctor about switching from Keppra to a new medication.  Tr. 449.  He also indicated that addressing her depression through short term counseling might be useful.  Tr. 449.  Dr. Litwin concluded by stating:

> Despite her reduced memory, Lanieca is bright, resourceful and has strong
> aptitude levels.  She should have strong vocational potential but must avoid
> settings in which strong memorization and ongoing learning would be required.

Tr. 450.

### c.      Wilfredo M. Paras, M.D.

On September 13, 2011, Wilfredo M. Paras, M.D., conducted a one-time consultative

examination.  Tr. 344-350.  Dr. Paras reviewed Huff's past medical history, vocational history

and daily activities.  Tr. 344, 346.  He conducted a physical examination noting that Huff was a

tall, obese female who was alert, oriented, coherent, pleasant and cooperative; had some long

term memory loss; walked with no assistive device but had a slight wassling gait; was teary at

times; complained of lower abdominal discomfort and pain; was in no acute cardiorespiratory

distress; abdomen was moderately obese and soft with slight discomfort on palpation of lower

abdomen; no edema or varicosities in extremities; no motor or sensory deficits; no muscle

atrophy; deep tendon reflexes were reduced bilaterally; no evidence of joint heat or swelling; no

crepitus in knees; posture was normal; some pain on limited range of motion on left shoulder

muscle and joint; and some stiffness of low back  on limited range of motion.  Tr. 345-346.  Dr.

Paras's impression was: (1) history of hypertension, controlled by blood pressure medication; (2)

history of CHF, which appeared to be compensated by blood pressure medication; (3) history of

chest pain; (4) history of remote status post brain surgery for subdural hematoma, secondary to

head trauma; (5) history of seizure episode, currently on Keppra; (6) history of uterine fibroids;

(7) history of anemia, most probably secondary to heavy menstrual bleeding; (8) history of

chronic low back pain; and (9) obesity.  Tr. 345.  In summary, Dr. Paras opined that:

> [B]ased on the history and objective findings, this claimant's ability to perform
> work-related physical activities are limited by her multiple medical conditions and
> its manifestions.  Her general work limitations is sedentary work.

Tr. 345.

**D.      Testimonial evidence**

**1.      Plaintiff's testimony**

Huff was represented at and testified at the hearing. Tr. 42-62, 66-69.  Huff explained that, after losing her job with Greyhound in February 2011, she did not return to work because, in March of that year, she had her first grand mal seizure.  Tr. 43-44.  Huff indicated that, after losing her job in February 2011, she had been looking for work and still wanted to work but then had the seizure.  Tr. 45.  She indicated that her most recent grand mal seizure had been shortly before the hearing on February 10, 2013.  Tr. 44.   Huff takes medication for her seizures.  Tr. 55. Except for her February 2013 seizure, she thinks that the medication she takes helps her with the grand mal seizures.  Tr. 55.  However, she is not certain it helps her entirely because an EEG in 2011 showed she was still having seizures.  Tr. 55.  She indicated that she missed her medication the night and morning preceding her February 2013 seizure.  Tr. 55.  She tries to remember to take her medication because the seizures hurt her body all over for days following a seizure but she sometimes just forgets or takes too much because she forgets that she has taken the medication.  Tr. 55-56.

In addition to her grand mal seizures, Huff experiences shaking on her right side, mainly in her right arm and hand.  Tr. 58-59.  Following her February 2013 seizure, she noticed that the shaking was more frequent.  Tr. 59.

Huff is able to perform some chores around the house such as washing dishes and cooking.  Tr. 48.  She does laundry at the laundromat.  Tr. 48-49.  Huff's doctor will not let her drive because of her seizures.  Tr. 43-44, 49.  Huff knows how to use a computer but does not have one at her house and does not use the computers at the library.  Tr. 51.  She used to go to

the library but had not been in a while.  Tr. 51.  Huff goes grocery shopping.  Tr. 52.  Since she

does not drive, she takes the bus.  Tr. 53.  If she has to take a bus she will but usually one of her

daughters is with her especially if she is going somewhere far because she does not want to get

lost.  Tr. 57.   If one of her sisters has a car, she might ask them to take her places.  Tr. 57-58.

She used to a have a rolling cart to help her with the heavy items because it hurts her head to lift

heavy items.  Tr. 52-53, 54.  However, her grandchildren broke her cart.  Tr. 52.  Up until

February of 2012, she was helping raise her four grandchildren.  Tr. 48.   Although her

grandchildren no longer live with her, Huff continues to have contact with them.  Tr. 49-50.   She

has contact with her children and mother too.  Tr. 50.  Other than family, Huff does not visit with

anyone and does not like to be around people.  Tr. 53-54, 57.

When asked if she felt she could work, Huff indicated she was not sure.   Tr. 60.  She

indicated that, even if she had counseling, she did not know whether she would be able to work,

even part-time.  Tr. 60.  Huff really likes people and used to be able to talk to people and hold a

conversation but her mind is no longer where it used to be and she is unable to talk to people like

she used to.  Tr. 61-62.  Huff does not believe that she is able to handle stress well.  Tr. 62.

## 2.    Vocational Expert's testimony

Vocational Expert ("VE") Carol Mosley testified at the hearing.  Tr. 62-76.  The VE

described Huff's past relevant work as including work as a ticket agent or transportation clerk at

Greyhound (light, SVP 5[8] work); cashier at a grocery store (light, SVP 2); and sales attendant in

a department store (light, SVP 2).  Tr. 65.

---

[8] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.
Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the
skill level definitions  in  20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-
skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

For his first hypothetical, the ALJ asked the VE to assume a hypothetical individual Huff's age and with Huff's education and work experience who is able to perform work at a light level, lifting up to 20 pounds occasionally and 10 pounds frequently; standing and/or walking for up to 6 hours and sitting for up to 6 hours in an 8-hour workday with normal breaks; occasionally climbing ramps and stairs but never climbing ladders, ropes or scaffolds; occasionally balancing, stooping, kneeling, and crouching but never crawling; avoidance of concentrated exposure to fumes, odors, dust, gasses, and poorly ventilated areas; avoidance of all exposure to hazardous machinery and unprotected heights and commercial driving; limited to non-complex tasks such as tasks that can be learned in 30 days; limited to low-stress tasks such as tasks that do not require high production quotas, strict time requirements, work that is paid at a piece rate, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others; and limited to superficial interaction with coworkers and the public. Tr. 69-70. The VE indicated that the described individual would be unable to perform Huff's past relevant work but there would be other jobs available, including (1) packer, with over 3,500 positions available statewide and over 450,000 available nationwide; (2) assembler of small products, with over 2,500 positions available statewide and over 500,000 nationwide; and (3) inspection worker, with over 3,000 positions available statewide and over 400,000 nationwide. Tr. 70-71.

For his second hypothetical, the ALJ asked the VE to assume a hypothetical individual as described in the first hypothetical except that the individual would be limited to sedentary work (lifting up to 10 pounds occasionally, standing and/or walking for up to 2 hours and sitting for up to 6 hours in an 8-hour workday with normal breaks). Tr. 71. The VE indicated that the following jobs would be available to the described individual: (1) bench assembler, with over 2,000 positions available statewide and over 500,000 nationwide; (2) inspection work, with over

1,800 positions available statewide and over 450,000 nationwide; and (3) sorter, with over 2,000 available statewide and over 450,000 nationwide.  Tr. 72-73.

The VE indicated that being off-task 20% of the workday would not be consistent with competitive employment.  Tr. 74.  The VE indicated, however, that being off-task 5% of the workday would not change her answers to the hypothetical questions.  Tr. 76.  The VE indicated that, in the unskilled field, employers would generally tolerate one unexcused absence per quarter.  Tr. 74.

Huff's counsel asked the VE whether restricting the hypothetical individual to no work pressure or stress because of an inability to handle even mild work pressure would impact her testimony.  Tr. 75.  The VE indicated that she would need more of a description noting that "with any job there is stress associated with it.  It's just that there's degrees of it."  Tr. 75.  The VE further noted that the ALJ had included restrictions that accounted for a decreased stress level such as no complexity in tasks; no production quotas; and no arbitration, negotiation and confrontation.  Tr. 75.  Following the foregoing exchange, Huff's counsel indicated that she had no further questions.  Tr. 75.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[11] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his May 17, 2013, decision, the ALJ made the following findings:[12]

1.      Huff meets the insured status requirements through December 31, 2015.
Tr. 24.

2.      Huff has not engaged in substantial gainful activity since February 18,
2011, the alleged onset date.  Tr. 24.

3.      Huff has the following severe impairments: obesity; lumbar degenerative
disc disease; history of subdural hematoma and status-post brain surgery;
osteoarthrosis;  enlarged  fibroid  uterus;  endometrial  fibroid;
seizures/epilepsy; asthma; lower extremity edema with cellulitis; anxiety
disorder; cognitive disorder, not otherwise specified; and depressive
disorder.  Tr. 24-25.

4.      Huff does not have an impairment or combination of impairments that
meets or medically equals the severity of one of the listed impairments.
Tr. 25-26.

5.      Huff has the RFC to perform light work defined as lifting up to 20
pounds occasionally and up to 10 pounds frequently, standing and/or
walking up to 6 hours and sitting for up to 6 hours in an 8 hour workday,
with normal breaks; limited to occasionally climbing ramps and stairs;
never climbing ladders, ropes or scaffolds; limited to occasionally
balancing, stooping, kneeling, and crouching; never crawling; should
avoid concentrated exposure to fumes, odors, dusts, gases, and poorly
ventilated areas; should avoid all exposure to hazardous machinery,
unprotected heights and commercial driving; limited to non-complex
tasks, such as tasks that can be learned in 30 days; limited to low-stress
tasks, such as tasks that do not require high production quotas, strict time
requirements, piece work, or work that involves arbitration, negotiation,
confrontation, directing the work of others, or being responsible for the
safety of others; limited to superficial interaction with coworkers and the
public; and will be off task for 5% of the time.  Tr. 26-30.

6.      Huff is unable to perform past relevant work. Tr. 30.

---

[12] The ALJ's findings are summarized.

7.      Huff was born in 1975 and was 36 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 31.

8.      Huff has at least a high school education and is able to communicate in English.  Tr. 31.

9.      Transferability of job skills is not material to the determination of disability.  Tr. 31.

10.     Considering Huff's age, education, work experience and RFC, there are jobs that existed in significant numbers in the national economy that Huff can perform, including packer, small products assembler, and inspection worker.  Tr. 31-32.

Based on the foregoing, the ALJ determined that Huff had not been under a disability from February 18, 2011, through the date of the decision.  Tr. 32.

## V. Parties' Arguments

Huff argues that the ALJ erred by not giving substantial weight to the opinions of one-time consultative examining physicians/psychologists Dr. Konieczny, Dr. Litwin, and Dr. Paras and by relying on and granting significant weight to the state agency reviewing physicians because those physicians did not examine her and rendered their opinions without having reviewed Dr. Litwin's report.  Doc. 15, pp. 11-15.   Huff further contends that, because the ALJ did not properly weigh the medical opinions, the VE hypothetical presented to the VE was incomplete and the ALJ was therefore precluded from relying upon the VE's testimony to support his decision. Doc. 15, pp. 15-17.  Huff also argues that, while the vocational reports are not medical opinions, the reports support her claim that she is more limited than the ALJ determined her to be.  Doc. 15, p. 15.

In response, the Commissioner argues that Huff's own treating source, Dr. Kaiboriboon, does not support her claim for disability benefits and the ALJ properly considered and assessed the opinions offered by the consultative examining physicians/psychologists.  Doc. 16, pp. 11-

15.  With respect to Dr. Paras, the Commissioner also argues that, even if Dr. Paras's limitation

of sedentary level work had been adopted by the ALJ, Huff would still be found not disabled

because the VE testified that a sedentary limitation would not preclude other work in the national

economy.  Doc. 16, p. 15.  The Commissioner contends that Huff's reliance on the Ohio

Rehabilitation Services Commission classification of her as "most significantly disabled" is

misplaced because a subsequently issued vocational report indicated that Huff was ready for

employment.  Doc. 16, p. 16.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be

conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.

Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.     The ALJ properly considered and weighed the medical opinion evidence**

Huff argues that the ALJ did not properly weigh the medical opinion evidence.  Doc. 15, pp. 11-15.  She contends that the ALJ should have given substantial weight to the opinions of consultative examining physicians/psychologists Dr. Konieczny, Dr. Litwin, and Dr. Paras and that the ALJ improperly gave significant weight the state agency reviewing physicians because those physicians did not examine her and rendered their opinions without having reviewing Dr. Litwin's report.  Doc. 15, pp. 11-15.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a); 404.1546(c).  It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  In assessing a claimant's RFC, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

As one-time examining psychologists/physicians, Drs. Konieczny, Litwin, and Paras did not have an ongoing treatment relationship with Huff and therefore their opinions were not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.*, 152 Fed. Appx. 485, 490 (6th Cir. 2005).   It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527.  *See* 20 C.F.R. § 404.1527(c). Those factors include (1) the length of the treatment relationship and the frequency of the

examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Id.*  However, even when the opinion at issue was rendered by a treating physician, which is not the situation in this case, the ALJ is not obliged to include in his decision an exhaustive factor-by-factor analysis of the factors.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Although Drs. Konieczny, Litwin, and Paras were not treating physicians/psychologists, consistent with the regulations, as discussed more fully below, the ALJ's decision makes clear that the ALJ considered the opinions of Drs. Konieczny, Litwin, and Paras and explained the weight assigned to those opinions.

### Dr. Konieczny

The ALJ considered and weighed Dr. Konieczny's opinion stating, in part:

> Significant weight is given to the part of Dr. Konieczny's medical opinion that the claimant had moderate mental symptoms, that she could remember and carryout instructions, and had some difficulty in persistence with moderately complex multi-step tasks and some difficulty in attending to supervision situations in the work setting.  However, less weight is given to the portion of the medical opinion that the claimant would have difficulty in even mild pressure situations in the work setting as this is based on subjective complaints and is not supported by the fact that she is able to function in most activities of daily living and her work in the past.

Tr. 29.

The ALJ did not ignore portions of Dr. Konieczny's opinion.  Rather, the ALJ explained that, while the moderate limitations found by Dr. Konieczny were supported by the record and objective evidence, his significantly restrictive limitation, i.e., that because of her anxiety Huff would have difficulty in even *mild* pressure work situations, was not supported by the record and based on subjective complaints.  Tr. 29.  Huff argues that Dr. Konieczny's opinion was clearly

based on his evaluation and not subjective complaints, noting that Dr. Konieczny observed that Huff became more tearful as the evaluation continued. Doc. 15, p. 13. However, while Dr. Konieczny indicated that Huff was more tearful as the evaluation progressed, he also indicated that she nonetheless was able to respond to all questions and tasks posed to her. Tr. 338.

Huff also takes issue with the ALJ's consideration of her daily activities when weighing Dr. Konieczny's opinion yet, under 20 C.F.R. § 404.1527(c), an ALJ may consider any other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(6). Thus, the ALJ's consideration of the extent of Huff's daily activities when weighing the opinion of a one-time examining psychologist was consistent with the Regulations.

Huff also argues that test results from tests administered by Dr. Konieczny support her claim that more weight should have been given to Dr. Konieczny's opinion that Huff would have difficulty in even mild pressure situations. Doc. 15, p. 13. More particularly, she contends that testing showed deficits in speed, accuracy of learning, writing symbols, and visual-motor coordination. Doc. 15, p. 13. While the ALJ assigned less weight to Dr. Konieczny's opinion regarding Huff's ability to handle stress, the ALJ nonetheless accounted for limitations in handling stress in the work setting. In particular, the ALJ restricted Huff to:

> . . . non-complex tasks, such as tasks that can be learned in 30 days . . . low-stress tasks, such as tasks that do not require high production quotas, strict time requirements, piece work, or work that involves arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others . . . superficial interaction with coworkers and the public . . .

Tr. 27.

During the hearing, Huff's counsel asked the VE a hypothetical question which added the limitation of not being able to handle even mild work pressure. Tr. 75. The VE asked counsel to clarify his hypothetical, noting that, with any job there is stress associated with it and, when she

had responded to the ALJ's hypothetical question, she considered limitations aimed at decreasing the level of stress.  Tr. 75.  The ALJ agreed that there were restrictions included in his VE hypothetical relating to an individual's ability to handle stress.  Tr. 75.  While Huff asks that her case be remanded for inclusion of the limitation of having "difficulty in even mild pressure situations in the work setting" in the RFC (Doc. 15, pp. 12-13.), following the foregoing exchange at the hearing regarding low stress limitations, Huff's counsel did not attempt to clarify the proposed hypothetical limitation of not being able to handle even mild work pressure. Furthermore, although less weight was assigned to a portion of Dr. Konieczny's opinion, Huff has not demonstrated that the low stress limitations included by the ALJ in the RFC are insufficient to account for her stress related limitations.

As discussed herein, consistent with the Regulations, the ALJ made clear in his decision that the entirety of Dr. Konieczny's opinion was considered and he explained the weight assigned to Dr. Konieczny's opinion.   Huff has not demonstrated that those reasons are unsupported by the record or that further limitations beyond those included in the RFC are necessary to adequately account for limitations contained in Dr. Konieczny's opinion.  Thus, reversal and remand is not warranted for further evaluation of Dr. Konieczny's opinion.

### Dr. Litwin

The ALJ considered and weighed Dr. Litwin's opinion, stating, in part:

[Dr. Litwin] gave the medical opinion that the claimant had functional limitations in reduced self-direction due to memory loss and potential difficulty with motivation and mental persistence due to underlying depression and distrust of others.   He added that the claimant must avoid settings in which strong memorization and ongoing learning would be required (Ex. 10F).  Less weight is given to Dr. Litwin's medical opinion because it is inconsistent internally with his report.  He notes that claimant had an average working memory score on the WAIS-IV examination and indicated that she had no weakness in attention span or working memory.  Then later in his report, his opinion is different, indicating that the claimant has an underlying weakness in memory (Ex. 10F at 2-3).  Other

27

than the claimant's subjective reports, none of the other medical professional[s] indicated that claimant suffered from difficulties in memory.

Tr. 29-30.

Huff takes issue with the ALJ's discussion and reliance on the WAIS-IV testing results without discussing the other testing performed by Dr. Litwin.  Doc. 15, pp. 13-14.  However, the ALJ clearly considered the entirety of Dr. Litwin's opinion, including Dr. Litwin's interpretation of the test results from tests other than the WAIS-IV.  Tr. 29-30.  Dr. Litwin concluded that the memory skills tests (California Verbal Learning Test-II (long form) and Brief Visual Spatial Memory Test-Revised) showed that Huff had some underlying weaknesses in memory. Tr. 448. Although the ALJ did not mention these two tests by name, the ALJ discussed Dr. Litwin's conclusions, which were based on these two tests, stating that Dr. Litwin indicated that Huff had "underlying weakness in memory."  Tr. 29-30.   Having considered the entirety of Dr. Litwin's opinion, the ALJ concluded that Dr. Litwin's opinion was internally inconsistent.

Further, in giving less weight to Dr. Litwin's opinion, the ALJ considered not only the lack of internal consistency in Dr. Litwin's opinion but also the lack of consistency of Dr. Litwin's opinion with other evidence, noting for example that no other medical professional indicated that Huff suffered from difficulties in memory.  Tr. 30; *see e.g.,* Tr. 340 (Dr. Konieczny's opinion that Huff had no significant deficits in her ability to understand, *remember*, and carry out instructions) ((emphasis supplied).[13]  Huff has not challenged this basis for discounting Dr. Litwin's opinion nor argued that this finding is unsupported by the record.

Finally, the ALJ did not completely dismiss Dr. Litwin's opinion or fail to account for memory loss issues.  Dr. Litwin opined that Huff "should have strong vocational potential but

---

[13] Dr. Paras noted "some long term memory loss" when describing Huff's general appearance (Tr. 345) but performed no testing and offered no opinion regarding Huff's mental limitations.  Further, as noted, Huff has not challenged the ALJ's finding that Dr. Litwin's opinion was not supported by other medical professionals' opinions.

28

must avoid settings in which strong memorization and ongoing new learning would be required." Tr. 450.  He also indicated that, due to her memory loss, Huff would have reduced self-direction. Tr. 449.  Having considered and weighed Dr. Litwin's opinion as well as the entirety of the record, the ALJ included RFC limitations of non-complex tasks, such as tasks that can be learned in 30 days, low-stress tasks, and being off-task 5% of the time.  Tr. 27.  Huff has not shown that those limitations do not adequately account for limitations attributed to memory loss.

As discussed herein, consistent with the Regulations, the ALJ made clear in his decision that the entirety of Dr. Litiwn's opinion was considered and he explained the weight assigned to Dr. Litwin's opinion.  Huff has not demonstrated that the ALJ's reasons are unsupported by the record or that further limitations beyond those included in the RFC are necessary to adequately account for her memory loss issues and/or limitations contained in Dr. Litwin's opinion.  Thus, reversal and remand is not required for further evaluation of Dr. Litwin's opinion.

### Dr. Paras

The ALJ considered and weighed Dr. Paras's opinion stating:

> Dr. Paras gave the medical opinion that the claimant was generally restricted to sedentary work (Ex. 4 at 3).  Dr. Paras' medical opinion is given less weight because it is inconsistent with the objective medical evidence, which are mild to moderate at best.

Tr. 29.

After discussing Dr. Paras's physical examination findings,[14] the ALJ concluded that Dr. Paras's opinion was inconsistent with the objective evidence.  Huff contends, however, that Dr. Paras's sedentary work opinion was based on objective evidence, i.e., Huff's obesity, evidence of fibroids, her history of brain surgery for subdural hematoma, history of hypertension, history of

---

[14] Dr. Paras noted a slight wassling gait, obesity, some lower abdominal discomfort, reduced reflexes, and some left shoulder pain and low back stiffness on range of motion testing.  Tr. 345.  Otherwise, Dr. Paras's physical examination findings were generally benign.  Tr. 345.

remote congestive heart failure, history of anemia, history of chronic low back pain, and an MRI showing degenerative disc disease at two levels and displacement of the traversing right L5 and S1 nerve root.  Doc. 15, p. 14.  Huff's argument amounts to a request that this Court reweigh evidence already considered by the ALJ, which this Court may not do.  *See Garner*, 745 F.2d 383, 387 (6th Cir. 1984) (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").  Furthermore, the ALJ asked the VE to consider an individual limited as set forth in the RFC but who would be limited to sedentary rather than light work and, in response, the VE identified jobs in the state and national economy that the described individual could perform.  Tr. 71-73.  Thus, even if Dr. Paras's sedentary work opinion was given full weight, the VE's testimony at the hearing demonstrates that the outcome of the decision would not have changed.

Based on the foregoing, Huff has not shown that reversal and remand is warranted for further evaluation of Dr. Paras's opinion.

### *State agency reviewing consultants*

The ALJ also considered the opinions of state agency reviewing consultants and gave those opinions significant weight.  Tr. 30.  Huff takes issue with the ALJ's assignment of significant weight to those opinions, arguing that the state agency reviewing consultants did not examine Huff and rendered their opinions without the benefit of reviewing Dr. Litwin's neuropsychological opinion.  Doc. 15, p. 15.  The lack of examination by the state agency reviewing consultants is not a basis for finding that the ALJ gave improper weight to those opinions.  In fact, the Regulations make clear that opinions from non-examining sources are to be considered and weighed.  *See* 20 C.F.R. § 404.1527(e) (indicating, "all evidence from nonexamining sources" is considered to be "opinion evidence").  Also, even if the state agency

reviewing consultants did not have had an opportunity to review Dr. Litwin's opinion, the ALJ considered and weighed Dr. Litwin's opinion. Further, Huff has not demonstrated that the state agency reviewing consultants' opinions are not supported by the record.

Based on the foregoing, Huff has failed to demonstrate error with respect to the ALJ's consideration of and weighing of the opinions offered by the state agency reviewing consultants.

**B.      The ALJ's Step Five Finding is supported by substantial evidence**

Huff's claim that the ALJ erred in relying on the VE testimony to support his Step Five finding is premised upon her claim that the ALJ erred in weighing the medical opinion evidence. As discussed above, the ALJ properly considered and weighed the medical opinion evidence.

Further, consistent with the Regulations, the ALJ assessed Huff's RFC based on all relevant evidence and Huff has failed to demonstrate that the RFC is not supported by substantial evidence. For example, Huff's treating neurologist Dr. Kaiboriboon instructed Huff not to drive, not to work in close proximity of machines with moving parts, not to swim unsupervised or work at high places and to shower (without accumulation of water) rather than bathe, if unsupervised (Tr. 381, 384, 386, 393, 427, 430) but did not indicate that Huff was restricted from or unable to work. Consistent with Dr. Kaiboriboon's restrictions, the ALJ included in Huff's RFC a requirement that she avoid exposure to hazardous machinery and unprotected heights. Tr. 27.

Huff also argues that the vocational reports support her claim of disability. Doc. 15, p. 15. The ALJ considered the vocational reports, noting that the Ohio Rehabilitation Services Commission found Huff eligible for services and classified her in the most significantly disabled category but, following vocational testing, a determination was made that Huff appeared to be employable and there were occupations that Huff should consider because those occupations appeared to be within Huff's capabilities and physical limitations. Tr. 30. The ALJ found that

the evidence supported vocational assessment that Huff was ready for employment.  Tr. 30.  In her vocational evaluation, vocational rehabilitation consultant Ms. Dhayer checked a box indicating that employment should be "Part Time, as indicated by her physician."  Tr. 464.  The ALJ, however, found that there was a lack of evidence to limit her employment to part-time.  Tr. 30.  Huff does not argue or demonstrate support for Ms. Dhayer's limitation of part-time employment.  Huff only recites Ms. Dhayer's statement that Huff was only able to work part-time as indicated by her physician but she does not indicate or point to which physician limited her to part-time employment.

Since the VE testimony upon which the ALJ relied was provided in response to a hypothetical question that accurately portrayed the limitations found by the ALJ as credible and supported by the evidence and contained in the RFC, the ALJ's reliance upon the VE testimony was proper and constitutes substantial evidence to support the finding of no disability.  *See Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: September 9, 2015

Kathleen B. Burke
United States Magistrate Judge